# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| ALISON L. ABRAHAM | ) | CASE NO. 3:20-cv-2315 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.,* | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Alison L. Abraham (Plaintiff), challenges the final decision of Defendant Kilolo

Kijakazi, Acting Commissioner of Social Security (Commissioner),[1] denying her application

Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381

*et seq.* (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be REVERSED and REMANDED for

proceedings consistent with this opinion.

## I. Procedural History

On January 7, 2017, Plaintiff protectively filed an application for SSI, alleging a disability

onset date of April 23, 2012, which she later amended to December 24, 2015. (R. 11, Transcript

("Tr.") 193, 204). The application was denied initially and upon reconsideration, and Plaintiff

requested a hearing before an Administrative Law Judge (ALJ). (Tr. 102-105, 111-115, 116-118).

---

[1]  Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party."
Fed. R. Civ. P. 25(d).

Plaintiff participated in the video hearing on November 6, 2018, was represented by counsel, and testified. (Tr. 39-66 ). A vocational expert (VE) also participated and testified. (Tr. 60). On February 25, 2019, the ALJ found Plaintiff not disabled. (Tr. 10). The Appeals Council denied Plaintiff's request to review the ALJ's decision on August 18, 2020, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4).

Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 12, R. 14, R. 15). Plaintiff asserts the following assignments of error: (1) The ALJ erred in failing to provide good reasons for the weight given to the opinion of treating specialist Alexander Mauskop, M.D. and (2) The ALJ erred when evaluating Plaintiff's symptoms, overstating daily activities, finding only "conservative treatment" despite Plaintiff's multiple interventions for migraine headaches, and ignoring third-party statements. (R. 12. Page#ID 836, 849, 854 ).

## II. Evidence

### A. Relevant Medical Evidence[2]

1. **Treatment Records**

   a. **Fibromyalgia, Psoriatic Arthritis, Obesity and Right Clavicle**

Robert Perhala, M.D., has treated Plaintiff since April 2012 for complaints of muscle and tendon pain, muscle fatigue, headaches and rash. (Tr. 537). In the years leading up to Plaintiff's alleged onset date, Dr. Perhala diagnosed fibromyalgia, while also noting complaints of a skin rash and fatigue. (Tr. 497-541).

In February 2016, Dr. Perhala documented that Plaintiff had done fair to poor in her control

---

[2]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

of fibromyalgia. (Tr. 493). The doctor noted Plaintiff's complaints of increased pain and headaches since a December 2015 motor vehicle accident. (Tr. 493-494). Dr. Perhala's clinical examination revealed no tenderness over Plaintiff's scalp; moderate tenderness of the thoracic paraspinal area bilaterally; significant tenderness bilaterally of the cervical paraspinal and lumbar paraspinal areas. (Tr. 494). Plaintiff walked with a slightly antalgic gait and had 14/18 tender points with 0 tender joints. (Tr. 494-495). She had grossly normal range of motion, strength, sensation, and reflexes in her extremities. (Tr. 494-495). Although Dr. Perhala informed Plaintiff that he had stopped prescribing narcotics as of January 1, 2016, he gave her one last prescription of Tramadol. He also prescribed Cyclobenzaprine, Medrol dose pack, Mobic and Cymbalta. (Tr. 496).

Dr. Perhala's September and October 2016 clinical examination records remained nearly identical to the February examination, with the exception that Plaintiff had 6 tender joints during these exams. (Tr. 492, 487). Plaintiff's laboratory testing showed an elevated CRP consistent with an autoimmune component for her pain, and likely associated with her Psoriatic Arthritis. (Tr. 492). Dr. Perhala initiated methytrexate ("MTX") treatment, which he described as a "high risk medication." (Tr. 492).

Concurrent to Dr. Perhala's treatment, Alison Winans, PA-C, examined Plaintiff from August 2016 through December 2016, for skin lesions/papules first consistent with psoriasis and, later, psoriatic arthritis. (Tr. 418-428). By December 2016, the record notes Plaintiff had some skin response to the MTX treatment and tender joints decreased from six to four. (Tr. 481, 483). Dr. Perhala increased the MTX dosage. (Tr. 484).

Dr. Perhala's 2017 treatment records continued to document Plaintiff doing "fair to poor" with psoriatic arthritis and fibromyalgia, while receiving "only fair" help from MTX treatment.

3

(Tr. 477, 714, 718, 722). In February 2017, Dr. Perhala described Plaintiff as weighing 153 pounds with a BMI of 30.9, which increased to BMI of 34.3 in May 2017. (Tr. 478, 715). The doctor's records note clinical signs continued to reflect Plaintiff's normal presentation, except for a slightly antalgic gait, mildly limited ROM, moderate to significant tenderness of the spine, 14/18 tender points, and four tender joints. (Tr. 478-480, 715-716, 719-720, 723-724).

Imaging records in 2017 and 2018 revealed a surgical plate on the shaft of Plaintiff's clavicle, moderate cervical osteopenia, and a mild deviated septum. (Tr. 706, 709, 716, 757-758). An x-ray of Plaintiff's cervical spine appeared normal. (Tr. 709). Dr. Perhala also documented claimant's status post right shoulder surgery, describing Plaintiff's right shoulder/trapezial muscle as refractory to aggressive care and encouraging her to manage the "best she can." (Tr. 717).

In December 2017, Dr. Perhala added what he described as a second "high risk medication," Humira, in addition to MTX, but Plaintiff reported, in May 2018, that she never initiated the treatment and she stopped MTX due to her concerns of side effects. (Tr. 725, 726). Despite the change in medications, Plaintiff's clinical presentation remained the same. (Tr.727-728). Dr. Perhala suggested Plaintiff continue with caudal blocks before reconsidering Humira. (Tr. 729).

Plaintiff saw Nurse Practitioner Amanda Horn who observed no significant physical or mental limitations and "grossly normal" neurologic functioning, in July 2018.[3]  (Tr. 762).

### b. Migraine/Headaches

Plaintiff began experiencing headaches in 2012, after a horseback riding incident. (Tr. 537). The headaches initially manifested with photophonophobia and osmophophobia, and were controlled with Imitrex. *Id*. She established treatment with the American Migraine Center (AMC)

---

[3]  The actual date is unclear as the records include a "Document Date" of August 8, 2018, and another date of October 31, 2018, but an "electronically signed" date of July 19, 2018. (*See, e.g.*, Tr. 762-64).

in January 2016. (Tr. 470-473). These records documented Plaintiff's complaints of migraine headaches with torticollis and continuous trapezius pain resulting in additional diagnoses of spasmadic torticollis, orofacial dystonia, and migraine with aura. (see, e.g., Tr. 435, 446). The AMC records note treatment including Botox and torodol injections that resulted in some pain free periods extending up to four days in a row. (*see, e.g.*, Tr. 435, 436, 438, 439, 442, 448, 452).

Alexander Mauskop, M.D., FAAN, Director of New York Headache Center, began treating Plaintiff on August 25, 2016. (Tr. 574, 581). Plaintiff's complaints included daily headaches with severe pulsatile intensity, resulting in nausea, vomiting, neck pain, osmophobia, photophobia, and exacerbated by light physical activity. *Id*. Plaintiff reported that Imitrex tablets improved her daily headaches, and "a single injection of Imitrex often provides her with complete relief for an entire day … [h]owever, her doctors have not been willing to let her take Imitrex daily despite the failure of many prophylactic and abortive medications and despite her severe disability without Imitrex." *Id*. On examination, Dr. Mauskop observed Plaintiff was mildly overweight with a BMI of 27 (*Id*.); normal findings regarding mental status, visual fields, extraocular movements, facial sensation, and shoulder shrug strength (Tr. 575); no sensory disturbances; supple neck with full range of motion; muscle spasm on palpation in the suboccipital, paraspinal cervical and trapezii muscles (*Id*.); and temporo-mandibular joints were tender on palpation. *Id*. Dr. Mauskop assessed Plaintiff "appears to have exacerbation of intractable chronic migraine headaches, which causes very severe disability (MIDAS score – 270, over 20 is severe disability)." *Id*. The doctor prescribed "sumatriptan injections and tablets as needed" with increased dosage of Gabapentin, and continued Botox injections in addition to Boswellia supplement and capsaicin nasal spray. *Id*.

Plaintiff also sought emergency treatment in May 2016 for migraine headaches causing neck tension without pain, vomiting, and diarrhea. (Tr. 685). Her mental and physical examination

findings appeared unremarkable. (Tr. 687). IV hydration and a headache cocktail including magnesium, Reglan, Solu-Medrol, Toradol and Benadryl significantly improved her symptoms, and she was discharged the same day. (Tr. 687, 690). In August 2016, Plaintiff returned with the same complaints and improved with treatment. (Tr. 691-693).

Plaintiff saw Dr. Mauskop in August 2017 and July 2018. In August, Plaintiff noted that the increased Gabapentin provided no additional relief and the doctor noted her "migraine-related disability" remained in the very severe range. (Tr. 577). Plaintiff reported that the Botox injections were somewhat effective, as were occasional nerve blocks. (Tr. 577). Dr. Mauskop performed a sphenopalatine ganglion block, and recommended Plaintiff begin taking Nardil. (Tr. 578-579). In July 2018, Dr. Mauskop described Plaintiff feeling worse, although Sumatriptan provided some daily relief. (Tr. 750). He once again gave Plaintiff a sphenopalatine ganglion block. (Tr. 751). At this time, Plaintiff's prescription for Sumatriptan injections included no more than twice a day, as needed, in addition to Gabapentin, Imitrex, Lorzone, Nardil, Reglan and Skelaxin. (Tr. 750).

On May 31, 2018, Alan Wine, M.D., observed that Plaintiff's psoriatic arthritis and fibromyalgia caused back tenderness and spasms. (Tr. 742).

The Impression from a CT Maxiofacial/Sinuses exam on August 3, 2018, was "[e]ssentially negative" although Plaintiff did have a minimal deviated septum. (Tr. 765-766). That same day, NP Horn noted that Plaintiff "sees neuro/migraine specialists, gets occipital nerve blocks and botox injections, sees specialist in NYC who rec she use nardil off label, but she did not" and stated she would attempt to get Almovig approved for Plaintiff's migraines after Plaintiff "failed numerous meds." (Tr. 762-63). Plaintiff returned five-days later, alert and oriented, but with a labile mood. (Tr. 769). NP Horn recommended Plaintiff try Rexulti to control her mood disorder and Almovig for her migraines, in an attempt to move Plaintiff off of Gabapentin and Imitrex (Tr.

6

770).

### c. Depression/Mood Disorder and Post-concussive Syndrome/Traumatic Brain Injury

Christopher M. Bailey, Ph.D., performed neuropsychological testing in January 2014 based on claimant's complaints of head injuries, fibromyalgia and depression. At that time, Plaintiff carried a six-credit hour workload at Community College. (Tr. 737). Dr. Bailey described Plaintiff as fully oriented and put forth a reasonable effort, but she had slowed reaction time and difficulties with complex attention, slowed math speed, auditory weaknesses, and her learning improved with repetition. (Tr. 737-738). The doctor observed that Plaintiff endorsed an elevated level of symptoms that worsened with testing, and concluded Plaintiff's presentation was consistent with persistent post concussive syndrome exacerbated by significant psychiatric distress, and possible traits of personality disorder/interpersonal difficulty. (Tr. 737-738). Dr. Bailey also noted that medication side effects may be slowing Plaintiff's reaction time and processing speed. (Tr. 738).

On November 23, 2015, Kelly Sprout, M.D., noted Plaintiff's complaints of interrupted sleep and poor concentration, with an otherwise unremarkable mental status. (Tr. 395). On January 4, 2016, after her alleged onset date, Dr. Sprout noted Plaintiff had dysphoric mood and poor concentration. (Tr. 396). In February 2016, Dr. Sprout diagnosed Plaintiff with major depression, recurrent and a mood disorder secondary to traumatic brain injury, bipolar type after Plaintiff presented with complaints of mania. (Tr. 405). In April 2016, Dr. Sprout noted mood swings, headaches, and poor concentration since her December 2015 car accident. (Tr. 408). Dr. Sprout observed normal mental status; and recommended Plaintiff continue Cymbalta for depression and start Lamictal once she had her headaches under control. (Tr. 408). At her last appointment in May

7

2016, Plaintiff reported that she was "doing okay" and "her moods are a little better", but she was experiencing headaches, nausea and vomiting that prevented her from taking medication. (Tr. 410). Dr. Sprout encouraged Plaintiff to take her medication "when able." *Id*.

On May 15, 2017, consultative psychologist Thomas M. Evans, Ph.D. evaluated Plaintiff at the State agency's request. (Tr. 567). During the examination, Plaintiff reported getting along "fine" with people and last saw a psychiatrist in 2015 (Tr. 568); she graduated high school was taking one on-line class. (Tr. 569). She relied on her parents to do the cooking, cleaning and shopping, although she could take care of her own medication. (Tr. 569). Plaintiff stated that she spent most days in bed with ice on her head. (Tr. 568).

Dr. Evans observed Plaintiff with good personal grooming and hygiene; she did not appear in any duress: answered all questions fully, with understandable, normal speech. (Tr. 569). Plaintiff stated her current mood was "pretty good," but overall mood had been "pretty depressed" and anxious. *Id*. Dr. Evans observed Plaintiff was alert and oriented with the ability to spell "world" forward and backward. *Id*. Plaintiff could recite seven digits forward and six digits backward, in addition to remembering two out of three words after five minutes. *Id*. Plaintiff had good insight and judgment. Dr. Evans diagnosed Plaintiff with persistent depressive disorder, moderate, and anxious distress. (Tr. 570).

On August 3, 2018, NP Horn observed Plaintiff's mental status as histrionic and as having a "flood of ideas" about her health issues. (Tr. 762). Plaintiff returned five-days later, alert and oriented, with a labile mood. (Tr. 769). Horn recommend Plaintiff try Rexulti to control her mood disorder. (Tr. 770). In October 2018, Horn described the entwined relationship between Plaintiff's migraines and mood, Plaintiff's concerns that attempts at medication management resulted in weight gain, and she continued to encouraged Plaintiff to start Rexulti. (Tr. 769).

### 2.   State Agency Opinions

On March 27, 2017, State agency medical consultant Mehr Siddiqui, M.D. opined Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (Tr. 77). The doctor opined Plaintiff had an unlimited ability to push and/or pull other than shown for lift and/or carry. Dr. Siddiqui opined Plaintiff's migraines and fibromyalgia did not limit her ability to balance and climb ramps/stairs, but she could never climb ladders/ropes/scaffolds, and frequently stoop, kneel, crouch and crawl. (Tr.77-78). Due to Plaintiff's chronic migraines, the doctor opined she should avoid concentrated noise and all exposure to hazards, but she otherwise maintained an unlimited capacity for extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. 78). On October 2, 2017, Gerald Klyop, M.D., affirmed Dr. Siddiqui's assessment. (Tr. 96-97).

On May 30, 2017, State agency consultative psychologist Bruce Goldsmith, Ph.D. opined Plaintiff experienced medically determinable depressive and anxiety related disorders that resulted in no limitation in the ability to understand, remember or apply information, and mild limitations in Plaintiff's abilities to interact with others, concentrate, persist or maintain pace and manage herself. (Tr. 74-75). Dr. Goldsmith concluded Plaintiff's mental impairments were not severe. (Tr. 75). On September 29, 2017, Paul Tangeman, Ph.D., agreed with Dr. Goldsmith's assessment. (Tr. 93).

### 3.   Treating & Examining Source Opinions

Neuropsychologist Christopher M. Bailey, Ph.D. examined Plaintiff on January 13, 2014, after her amended onset date, following referral "for neurological evaluation given a history of multiple concussions and associated postconcussive symptoms" and opined that "several

academic accommodations are appropriate." (Tr. 738). These included:

> 1) Extra time on all tests and assignments (1.5 times the standard allotment), 2) testing in a distraction-free room, 3) audio recording of lectures for review at a later time as needed, 4) use of a calculator for math-related coursework, 5) excused absences or regular breaks during class (as needed) given periods of possible symptom exacerbation.

(Tr. 738).

On May 15, 2017, consultative psychologist Dr. Thomas opined Plaintiff appeared to have no difficulties understanding, remembering or carrying out simple to moderately complex instructions in a workplace setting. (Tr. 570). In the other domains, Dr. Thomas did not provide a specific opinion; rather, he discussed Plaintiff's performance and her stated symptoms. The doctor noted there was no indication Plaintiff attempted to exaggerate symptoms, and she appeared capable of managing her own benefits.

On August 31, 2017, treating source Dr. Mauskop, opined that Plaintiff's:

> pain levels from daily severe migraines and the psoriatic arthritis make it nearly impossible to be in a public setting when perfumes, food smells, exhaust, light sensitivities, driving, and lingering cigarette smoke or fireplace smoke odors are present, even if just for seconds at a time. These odors trigger some of her worst migraines with extreme eye pain; the result is confinement to a dark room for the remainder of the day, sometimes for many days.

(Tr. 581). Dr. Mauskop also provided another medical source statement addressing the period August 25, 2016 to August 11, 2017, stating Plaintiff experienced "a) Chronic refractory migraine b) severe daily headaches with nausea, photophobia, phonophobia and osmopobia [and] c) genetic predisposition" with associated headaches symptoms of: prodromal symptoms, anorexia, nausea and vomiting, irritability, photophobia, and increased sensitivity to noise. (Tr. 572).[4] The headaches could occur more than once daily, last several hours per day, and medications caused

---

[4] The opinion is undated, but notes the last examination was August 11, 2017. (Tr. 572-73).

side effects including dizziness and weight gain. *Id.* The conditions would cause her to be absent from work three to thirty days per month. (Tr. 573).

### 4.  Third Party Source Statements

On May 31, 2018, Lorain County Community College staff member Keely McLoughlin documented Plaintiff's classroom accommodations including extended test time, separate testing room, use of a calculator, seating arrangement accommodation, the need for dark glasses or a hat in class, and the need for tests and quizzes to be printed on white paper. (Tr. 740).

On October 21, 2018, Plaintiff's grandmother, Gaynell Schatz, provided a statement regarding her observations of Plaintiff's functioning. She noted that Plaintiff no longer does activities like swimming or grooming/riding/showing horses. (Tr. 275). There are days when Plaintiff must stop at Schatz' home on her drive from school to rest. *Id*. Schatz concluded "I can see her pain through her eyes and body language then shortly she needs to leave quickly. Then she is in a dark room the rest of the day and night." *Id*.

On October 22, 2018, Rhoda G. Entwistle, Plaintiff's Great Aunt, submitted a letter regarding her observations of Plaintiff while on a Florida Vacation in 2016. (Tr. 276). Entwistle observed Plaintiff had to leave a restaurant after developing a severe headache. *Id*. She then observed Plaintiff had to leave the beach due to the onset of a headache from someone smoking. *Id*. Entwistle stated such events continued throughout the week, triggering Plaintiff's anxiety and causing headaches. *Id*. Plaintiff also had to change motel rooms due to smells. Entwistle stated that Plaintiff has not been able to remain at a restaurant since that time. *Id*.

## B. Relevant Hearing Testimony

During the November 6, 2018 hearing, Plaintiff testified as follows:

- She lives in a one-story barn like structure, paid for by her father, and has no issues

climbing stairs.

- She has graduated from high school and has been working on an associate degree for five years, taking one class at a time.

- Migraines prevent her from being out of the house too long. She has a history of headaches and head injuries due to riding accidents, but they were controlled with medication. The migraines have worsened since her 2015 car accident and she is on a lot of medication. Her pain levels increase as the day goes on.

- She maintains a valid driver's license, is able to drive, but it becomes difficult when her "eyes are hurting pretty bad."

- She cares for her own hygiene, although she may delay doing so when her head hurts.

- She receives pain management treatment that includes medication, injections, Botox and nerve blocks. She can take four Imitrex injections per day. Medications cause nausea.

- She has been diagnosed with depression, but she is not currently in treatment due to side effects from psychiatric medication and the effort would increase migraine pain.

- She can walk 10 minutes, but then stops because her head starts to pound.

- Her typical day involves waking, taking Imitrex by mouth, injecting Imitrex and then driving 30-45 minutes to school. She attends a 75-minute-long class, and then goes home to bed around 3:00pm due to pain and remains there until 10:00pm-12:00am.

- She cannot be around products or foods that smell. Her parents generally shop for her, but she will go once a month. She sees her parents, but otherwise only rarely sees other family. She does not have friends or hobbies. She cannot look at her phone for very long.

- She only takes prescribed medication. She must put ice on her eyes several times per week, depending on the timing with occipital nerve blocks.

(Tr. 45-54).

### III. Disability Standard

A claimant may receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform

"substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a) and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C. F.R. § 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since January 7, 2017, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: migraine headaches; post-concussive syndrome; fibromyalgia (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never work at unprotected heights, or around moving dangerous mechanical parts; she can occasionally operate a motor vehicle, and can occasionally work in conditions of humidity and wetness, in extreme heat or cold, in conditions where there are vibrations, and in conditions where there is concentrated exposure to dust, odors, fumes, or other pulmonary irritants; she is to do no work where she is required to use a screen; and she is limited to no exposure to noise at more than a moderate level or lighting that is more than a moderate light level.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on ***1994 and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The clamant has not been under a disability, as defined in the Social Security Act, since January 7, 2017, the date the application was filed (20 CFR 416.920(g)).

 (Tr. 12, 14, 18, 19).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is

supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a

whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

Plaintiff asserts the ALJ erred 1) by failing to provide good reasons for the weight given to the opinion from treating specialist Alexander Mauskop, M.D. and 2) when evaluating Plaintiff's symptoms, daily activities, migraine headaches, and ignoring third-party statements. (R. 12. Page#ID 836, 849, 854 ).

**1. Weight Accorded the Treating Source**

Although the "treating physician rule" was eliminated by a change in Social Security regulations that applies to all claims filed after March 27, 2017, Plaintiff filed her disability claim on January 7, 2017. Therefore, the treating physician rule applied; and as explained herein, the undersigned recommends remanding this matter because the ALJ's decision failed to consider that rule and did not provide good reasons for discounting Plaintiff's treating physician's opinions.

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F.Supp.3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.).

In addition, it is well-established that administrative law judges may not make medical judgments. As such, "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Meece v.*

*Barnhart*, 192 Fed. App'x 456, 465 (6ᵗʰ Cir. 2006) (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7ᵗʰ Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6ᵗʰ Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6ᵗʰ Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6ᵗʰ Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6ᵗʰ Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Although the ALJ referred to Dr. Mauskop as a treating provider, the ALJ's decision failed to consider the treating physician rule or analyze whether the provider's opinions were entitled to controlling weight. Rather, the ALJ discussed the opinion as follows:

> the undersigned gives little weight to Alexander Mauskop, M.D., and Christopher M. Bailey, Ph.D. Dr. Mauskop opined, the claimant's headaches are daily, lasting several hours, and would result in work absence from 3 to 30 days per month, and appears to have exacerbation or intractable chronic migraine headaches, which causes very severe disability (MIDAS score – 270, over 20 is severe disability) (10F, 11F/2). Dr. Mauskop also opined pain levels of the daily severe migraines and the psoriatic arthritis make it nearly impossible to be in a public setting when perfumes, food smells, exhaust, light sensitivities, driving, and lingering cigarette smoke or fireplace smoke odors are present, even if for just seconds at a time (12F). ***

(Tr. 17). Then the ALJ accorded little weight to opinions from Dr. Mauskop (and Dr. Bailey) concluding:

17

As the claimant's treating providers, they were able to personally examine the claimant. However, their opinions are not consistent with the record and appear extreme given the fact that claimant has had some good objective examination findings, such as exams frequently showed she is alert and oriented, in no acute distress 5/5 strength, and cranial nerves grossly intact (6F/3, 64, 16F/2-3, 19).

(Tr. 17-18).

The Commissioner does not challenge that Dr. Mauskop was a treating source, but argues that the ALJ "properly and reasonably declined to give controlling weight to Dr. Mauskop's opinion as part of his overall weighing of the evidence and final decision." (R. 14, PageID #877). The ALJ, however, does not adequately explain why the doctor's opinions are not well-supported by the record or medically acceptable clinical and laboratory diagnostic techniques. Rather, the ALJ merely provides a conclusory statement that the opinions are not consistent with and "appear extreme" compared with partial observations within selected records from another provider—records from Dr. Perhala in 2012, three years prior to Plaintiff's amended onset date, and 2017, 2018. (Tr. 18. *citing* Ex. 6F/3, Tr. 479, Dr. Perhala's February 10, 2017 note at Northern Ohio Arthritis Ctr., Inc. (NOAC); Ex. 6F/64, Tr. 540, Dr. Perhala's April 10, 2012 note at NOAC; Ex. 16F/2-3, Tr. 715-16, Dr. Perhala's May 19, 2017 note at NOAC; Ex. 16F/19, Tr. 732, Dr. Perhala's July 6, 2018 note at NOAC).

The ALJ's conclusory statement regarding Dr. Mauskop's opinions is not sufficient to satisfy the treating physician rule. *Cruz-Ridolfi v. Comm'r of Soc. Sec*. 2018 WL 113619 *citing Friend v. Comm'r of Soc. Sec*. 375 Fed. Appx. 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id*. at 552. Here, Dr. Mauskop treated Plaintiff for migraine issues, whereas Dr. Perhala treated Plaintiff for psoriatic arthritis and

18

fibromyalgia. Although the ALJ acknowledged Dr. Mauskop examined Plaintiff, the ALJ's decision fails to consider the doctor's clinical observations or how such findings are also supported by the observations of Dr. Perhala.

The Commissioner argues that the ALJ provided "good reasons" in weighing Dr. Mauskop's opinion (Tr. 877-879). The argument is not persuasive, as the the Commissioner cannot point to where in the decision the ALJ analyzed such evidence. Instead, citing *Burton v. Comm'r of Soc. Sec.*, the Commissioner broadly points to five pages of the decision as evidence of the ALJ's considered "the full body of the treatment notes," and suggests that demonstrates how Dr. Mauskop's opinions were inconsistent with and unsupported by the record. 690 F. App'x. 398, 402 (6th Cir. 2017); (R. 14 PageID # 878, *citing* Tr. 14-18). The current case is distinguishable from *Burton* the provider's treatment notes are not wholly unsupported.

Moreover, in making such argument, the Commissioner necessarily relies upon reasoning not in the ALJ decision—suggesting that in discounting the provider's opinions, the ALJ: 1) considered the full body of the evidence, 2) analyzed Plaintiff's mental and physical conditions, 3) implicitly considered the duration of Dr. Mauskop's treating relationship, 4) questioned the supportability of the opinions by stating they "appeared extreme," and 5) could have discounted it for providing little more than "check-box level insights." *Id*. Although those may be valid considerations when assessing a medical provider's opinions, the ALJ's decision does not expressly rely upon them—save for the unexplained conclusory statement that the opinions appear extreme—leaving it to subsequent reviewers to construct the analysis to support such a conclusion. Although the ALJ cites to parts of Dr. Perhala's clinical examinations to discount Dr. Mausop's opinions (Tr. 17-18), the decision inadequately considers these issues.

The Commissioner's response regarding the analysis of the record is unpersuasive for a

number of reasons. Dr. Perhala's February 10, 2017 examination, in addition to the ALJ's excerpt,[5] also included relevant findings not referenced by the ALJ of "mildly limited ROM" in the neck, "moderate tenderness of the thoracic paraspinal area bilaterally, significant tenderness of the cervical spinal area bilaterally, lumbar paraspinal area bilaterally," "tenderness of the shoulders bilaterally," 14/18 tender points of Fibromyalgia, in addition to four swollen joints and "slightly antalgic gait." (Tr. 477-478). Moreover, this is not a case of the ALJ weighing and then rejecting Dr. Perhala's objective analysis. Rather, the ALJ does not provide any discussion adequately connecting the consideration of Dr. Perhala's records with Dr. Mauskop's opinions.

The Commissioner's brief also does not address the ALJ's failure to evaluate the inconsistencies in the objective record. For example, the ALJ does not address that Plaintiff's psoriatic arthritis was confirmed by laboratory testing, mentioned as the primary reason for joint pain observed by Dr. Perhala in his objective clinical examination, and Dr. Mauskop specifically considered the combination of Plaintiff's psoriatic arthritis and migraine headaches on Plaintiff's ability to perform basic work activities. (Tr. 581-82). Both Dr. Mauskop and Dr. Perhala made clinical observations assessing Plaintiff with muscle spasms in her neck and trapezius muscles, in addition to the otherwise normal findings cited by the ALJ. (Tr. 17, 18, 575, 579, 581, 582).

The Commissioner defends the underlying decision, suggesting it relied upon clinical findings elsewhere in the record, by generally pointing to five pages of the ALJ's decision, Tr.

---

[5] The ALJ references parts of Dr. Perhala's clinical examinations to discount Dr. Mausop's opinion (Tr. 17-18). For example, the ALJ cites findings dated April 4, 2012, three years prior to Plaintiff's amended onset date, and to findings dated February 10, 2017, and May 19, 2017. (Tr. 537-540, 479, 715-716). The ALJ stated that that "exams frequently showed" "normal findings during examination, such as 5/5 strength in the upper and lower extremities, normal deep tendon reflexes, and normal sensation to touch, temperature, vibration and pinprick in all four extremities" and that "she is alert and oriented, no acute distress 5/5 strength, and cranial nerves grossly intact." (Tr. 16; 17, 18, *citing* Tr. 479).

14-18 (R. 14 PageID# 877), and the ALJ's consideration of Plaintiff's mental conditions as support for Plaintiff's ability to "perform reasonable daily activities and [that she] had no history of regular psychological care." (R. 14 PageID# 878). But the decision, even read as a whole, does not meaningfully analyze the record and explain the reasons for not giving controlling weight to Dr. Mauskop's opinions. *Gayheart v. Comm'r of Soc. Sec*, 710 F. 3d 365, 377 (6th Cir. 213) ("The failure to provide 'good reasons' for not giving [the treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation."). Rather, reviewing the record as a whole demonstrates that the ALJ relied upon clinical evidence that showed Plaintiff in a more favorable light than the record may otherwise demonstrate.

In addition, the underlying decision indicates "providers noted claimant remains on Gabapentin therapy with fair control of the fibromyalgia pain without significant side effects." (Tr. 16 *citing* Tr. 477). While giving credit to Plaintiff's reports regarding Gabapentin in therapy, the ALJ neglects to mention her additional complaints of headaches, fatigue, insomnia, arm tingling and that "MTX" was providing only "fair help" for the psoriatic arthritis which caused pain in her joints in addition to skin changes. (Tr. 477). While the ALJ infers "fair" as a positive, elsewhere in his records, Dr. Perhala associated "fair" with "fair to poor" and "only fair," and continued to describe Plaintiff as having pain despite the medication. (*see, e.g.*, Tr. 481). Dr. Mauskop noted "She has noticed that unusually severe migraine attacks causes a flare-up of her psoriasis and psoriatic arthritis, while worsening of arthritis also worsens migraines." (Tr. 581). The ALJ addressed Dr. Perhala's observations of Plaintiff's normal mood, but not his findings of fatigue. Tr. 480. Dr. Perhala's also noted his assessment of active Fibromyalgia requiring a "higher dose of MTX," a medication identified as "high risk" in addition to a Medrol Dose Pack and Mobic to

control pain." (Tr. 480).

Similarly, the ALJ cites to the May 2017 follow-up appointment at "16F/3" or Tr. 715. The ALJ does not address the fact that Dr. Perhala described Plaintiff as doing "fair to poor" since the February appointment with pain in the right trapezial region "that remains quite active with pain and swelling". (Tr. 714). Dr. Perhala continued to observe Plaintiff's slightly antalgic gait, and the same level of tenderness previously assessed in the neck, back and shoulders. (Tr. 715-716). As part of his care plan, Dr. Perhala discussed with claimant the fact that her "right shoulder/trapezial muscle and refractory to aggressive care" advising Plaintiff to "continue with this as best she can." Dr. Perhala's observations would appear to support Dr. Mauskop's statement that Plaintiff has muscle spasms around her scalp and trapezius muscles requiring thrice daily Lorzone. (Tr. 582).

The Commissioner also argues that Dr. Mauskop's opinion is essentially a series of check mark boxes. (R. 14 PageID #878-879). Indeed, "supportability" is one of the factors specifically set forth in the regulations used to evaluate opinion evidence, and states that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3). But the ALJ did not indicate he was discounting Dr. Mauskop's opinions (Tr. 572-573) because it was on a check-box form. Rather, the ALJ referenced the doctor's separate August 2016 and August 2017 narratives, the latter of which is a two-page letter citing his opinion (Tr. 17 *citing* Ex. 10F (Tr. 572-73); Ex 11F/2 (Tr. 575); Ex. 12F (Tr. 581-582)). Although the ALJ cited the opinions and documentation, the decision fails to explain why they are not supported by the record or the provider's objective findings.

Further, the court does not find the ALJ's lack of discussion of Dr. Mauskop's clinical

findings to be an "implicit" consideration of a limited treating relationship. The court is not able to assess the supportability for any findings that the ALJ used to conclude the treating source opinion "appeared extreme" as the ALJ did not conduct an adequate analysis of the full record or address apparent inconsistencies in a meaningful manner.

Finally, the Sixth Circuit has explained that a matter should not be remanded where the plaintiff cannot establish that "a ruling was anything but harmless error," noting the futility of "sending the case back to the ALJ" where it would not "serve any useful purpose …." *Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (*quoting NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)). However, in this instance, the ALJ did not meaningfully consider the treating physical rule, did not evaluate inconsistencies in the medical evidence, and failed to provide good reasons for discounting Dr. Mauskop's opinion. While the record contains additional non-treating state agency consultative opinions that may support the residual functional capacity the ALJ assessed for Plaintiff, the ALJ accorded these opinions great weight based upon the same inadequate evaluation of the evidence he used to reject Dr. Mauskop's opinion. (Tr. 17).

In formulating the Plaintiff's residual functional capacity, the ALJ without explanation rejected Dr. Mauskop's opinions that Plaintiff's "pain levels of the daily severe migraines and the psoriatic arthritis make it nearly impossible to be in a public setting when perfumes, food smells, exhaust, light sensitivities, driving, and lingering cigarette smoke or fireplace smoke odors are present, even if for just seconds at a time" and that she would be absent more than three days a month. (Tr. 17-18). Moreover, the vocational expert testified in response to ALJ questioning that a person absent more than two times per month or off task more than two fifteen-minute breaks and

23

one 30-minute lunch would be precluded from competitive employment. (Tr. 64). Additionally, a person who must work alone in a dark room would be precluded from work in the economy. (Tr. 64). While some of the RFC limitations may account for certain of these issues, the ALJ's decision lacks sufficient explanation permitting the court to draw such conclusion. In this instance, the ALJ's decision provides an inadequate consideration of Dr. Mauskop's treating records and opinions, which does not support a finding of harmless error.

Therefore, the undersigned finds that the ALJ erred by not considering and applying the treating physician rule and failing to provide good reasons for discounting Dr. Mauskop's opinion. While this court's decision renders no opinion regarding the merits of Plaintiff's disability claims or how the underlying records and opinion evidence should be weighed on remand, the Commissioner will have an opportunity, if this matter is remanded, to not only consider such issues but also to assess the Plaintiff's second assignment of error—contending that the ALJ erred when evaluating Plaintiff's symptoms, treatment, and activities of daily living. (R. 12. PageID.# 836). Consequently, the court declines to consider Plaintiff's second assignment of error, in the interest of judicial economy.

### VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be REVERSED and REMANDED to consider Dr. Mauskop's opinions under the treating physician rule and evaluate Plaintiff's alleged assignments of error through proceedings consistent with this opinion.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: February 3, 2022

24

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais,* 928 F. 3d 520, 530-31 (6th Cir. 2019).